UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

MICHAEL CROSSLEY; BART BAILEY; LET THE VOTERS DECIDE, LLC; V ALLEY DIRECT MARKETING LLC; IN THE FIELD, INC.; DISCOVERY PETITION MANAGEMENT LLC; PIR DATA PROCESSING INC.; CAROL YN OSTIC dba VOTER DIRECT, and CHRIS BRENTLINGER dba BAY AREA PETITIONS,

Plaintiffs,

v.

STATE OF CALIFORNIA; XAVIER BECERRA, in his capacity as Attorney General of the State of California; and "JOHN DOE," in his/her official capacity

Defendants.

Case No.:  20-cv-0284-GPC-JLB

**ORDER GRANTING MOTION TO DISMISS**

**[ECF No. 8]**

/ / /

/ / /

/ / /

This case presents a multi-pronged challenge to AB 5, a California state law enacted in 2019 which applies the three-factor "ABC" test, for determining whether a worker is an independent contractor or employee, to the entirety of the California Labor Code and the California Unemployment Insurance Code.  The Plaintiffs are individuals and businesses that collect signatures to qualify popular initiated referendums on the ballot for public vote.  The Plaintiffs have challenged AB 5 on numerous constitutional grounds, including, the Equal Protection Clause, the First Amendment and the California Constitution.  Before the Court is a motion to dismiss filed by Defendants State of California and Xavier Becerra, in his capacity as California Attorney General (collectively, "Defendants").  ECF No. 8.  Plaintiffs filed an opposition on May 6, 2020.  ECF No. 9.  Defendants filed a reply on May 15, 2020.  ECF No. 10.  The Court held a hearing on the matter on May 22, 2020.  Both parties subsequently filed supplemental briefing at the Court's invitation.  ECF Nos. 14, 15.

## BACKGROUND

Plaintiffs are data processing entities ("Data Processors") that utilize individuals and businesses ("Collectors") to collect signatures from registered voters on ballot initiatives and referenda throughout the United States, including the State of California.  Individual Plaintiffs, Michael Crossley and Bart Bailey, are two such Collectors who have rendered services to the Data Processors.  ECF No. 1 ("Compl.") ¶¶ 3-5.  In 2017, Individual Plaintiff Michael Crossley began collecting signatures for various Data Processors, including several Company Plaintiffs, pursuant to separately executed contracts, in order to obtain additional income.  *Id.* ¶¶ 52-54.  Similarly, in 2018, Individual Plaintiff Bart Bailey began collecting signatures in order to obtain additional income and selling the collected signatures to Company Plaintiffs on a petition-by-petition basis.  *Id.* ¶¶ 55-57.  Plaintiffs bring this action on behalf of a purported class defined as all data processors who utilize collectors within California, and on behalf of all

collectors who collect signature from registered voters pursuant to independent contractor relationships with data processors.  *Id.* ¶ 20.

Plaintiffs challenge California Assembly Bill 5 ("AB 5"), a recently-enacted statute that became effective on January 1, 2020, which defines how employment status is determined for purposes of certain state laws.  AB 5, Ch. 296, 2019–2020 Reg. Sess. (Cal. 2019).  Specifically, Plaintiffs seek declaratory relief as to whether Collectors are properly deemed "employees" under the test set out by AB 5 and whether AB 5 is unconstitutional and invalid.  Compl. ¶ 18.

California Assemblywoman Lorena Gonzalez introduced AB 5 with the purpose of codifying the decision of the California Supreme Court in *Dynamex Operations West, Inc. v. Superior Court of Los Angeles*, 4 Cal. 5th 903 (Cal. 2018), which set forth a three-factor "ABC" test to determine whether a worker is an independent contractor or employee for purposes of the California Industrial Welfare Commission's wage orders. According to the "ABC" test established by the *Dynamex* court, a worker should be considered an employee, unless the hiring entity establishes the following three factors:

> (A) that the worker is free from the control and direction of the hiring entity in connection with the performance of the work, both under the contract for the performance of the work and in fact, (B) that the worker performs work that is outside the usual course of the hiring entity's business, and (C) that the worker is customarily engaged in an independently established trade, occupation, or business.

*Dynamex*, 4 Cal. 5th 903 at 964.  AB 5 applies the ABC test to the entirety of the California Labor Code and the California Unemployment Insurance Code.  Compl. ¶ 28. AB 5 achieves this by adding a new provision incorporating the ABC test into Article 1 of the California Labor Code, Section 2750.3 and amending Section 606.5 of the Unemployment Insurance Code to incorporate the ABC test into the definition of "employee."  *Id.* ¶ 29.  Any employer who fails to abide by AB 5's requirements could be found guilty of a misdemeanor or felony, and could be subject to fines up to $1,000 and/or imprisonment for up to thirty days.  *Id.* ¶¶ 29-30, 41-42.

AB 5 includes a carve out for workers exempted from the ABC test.  *Id.* ¶ 34. These exemptions include workers who are "traditionally considered to be independent contractors" including those engaged in occupations requiring licenses, direct sales workers, and professional service providers.  *Id.* ¶ 35.

The contracts between most Data Processors, including Company Plaintiffs, and the Collectors either explicitly classify or treat the Collectors as "independent contractors" and indicate that Data Processors do not have certain obligations under the California Labor Code and that the Collectors do not have obligations as they would to more traditional employers.  *Id.* ¶ 63.  Plaintiffs argue that if AB 5 were enforced against Plaintiffs, by requiring them to classify the Collectors as employees rather than as independent contractors, Plaintiffs would be required to change their business model, and any existing independent contracts between Data Processors and Collectors would be invalidated.  *Id.* ¶ 59.  Plaintiffs argue this would have a detrimental effect on Collectors by depriving them of the opportunity to work in the manner that "provides the most flexibility for them."  *Id.*  Plaintiffs also contend that AB 5 would result in a reduction in the number of employable Collectors, thereby producing a "chilling effect on the collective ability" to place initiatives on election ballots.  *Id.* ¶¶ 61-62.

Plaintiffs state that the relationship between Company Plaintiffs and Collectors begins with either a "brief informational meeting" or another interaction that is "less formal" wherein the Company Plaintiffs explain how the signature collection process works and how the Collectors will be compensated.  *Id.* ¶ 45.  The Collectors' primary responsibility is to collect voter signatures and deliver these signatures in "raw" form to the Data Processors.  *Id.* ¶¶ 47, 51.  The Data Processor then inspects, and improves as necessary, the completed signature forms for resale to its clients, then submits the signature forms in "batched, refined" form to the downstream clients.  *Id.* ¶ 46.  The clients pay commissions to the Data Processors directly.  *Id.* ¶ 47.  The Data Processors consider the commissions received from the clients, and pay commission to the

4

Collectors on a "piece rate commission system," which takes into account the wide variation in the quantity and quality of the Collectors' raw signature submissions. *Id.* ¶ 46.

Plaintiffs argue that the Data Processors exert "no control whatsoever" over the Collectors' work since there is little uniformity in time and manner of the Collectors' work and the interactions between Data Processors and Collectors are minimal. *Id.* ¶¶ 48-50. Further, Plaintiffs assert that Collectors would be negatively affected if they were to be reclassified as "employees" since this could result in reduced work opportunities, higher taxation, and diminished control over their schedule and income opportunities. *Id.* ¶ 64.

Plaintiffs bring causes of action for declaratory relief on the basis that AB 5 violates the following: the federal and state constitution's Equal Protection Clauses (claims 1 and 2); the California Constitution's Inalienable Rights Clauses (claim 3); the federal and state Due Process Clauses (claims 4, 5, 6, 7, and 11); article I, sections 2 and 3, of the California Constitution (claim 8); the federal Ninth Amendment and California's "Baby" Ninth Amendment (claims 9 and 10); and the federal and state Contracts Clauses (claims 12 and 13). Plaintiffs seek injunctive relief to prevent the enforcement of AB 5 against Company Plaintiffs (claim 15), and in the alternative, Plaintiffs seek a court declaration that Individual Plaintiffs are independent contractors when working as Collectors for the Company Plaintiffs (claim 14).

## LEGAL STANDARD

Federal Rule of Civil Procedure ("Rule") 12(b)(6) permits dismissal for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). Dismissal under Rule 12(b)(6) is appropriate where the complaint lacks a cognizable legal theory or sufficient facts to support a cognizable legal theory. *See Balistreri v. Pacifica Police Dep't.*, 901 F.2d 696, 699 (9th Cir. 1990). Under Rule 8(a)(2), the plaintiff is required only to set forth a "short and plain statement of the claim showing that the pleader is

entitled to relief," and "give the defendant fair notice of what the ... claim is and the grounds upon which it rests." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007). A complaint may survive a motion to dismiss only if, taking all well-pleaded factual allegations as true, it contains enough facts to "state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 570). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* "In sum, for a complaint to survive a motion to dismiss, the non-conclusory factual content, and reasonable inferences from that content, must be plausibly suggestive of a claim entitling the plaintiff to relief." *Moss v. U.S. Secret Serv.*, 572 F.3d 962, 969 (9th Cir. 2009) (quotations omitted). In reviewing a Rule 12(b)(6) motion, the Court accepts as true all facts alleged in the complaint and draws all reasonable inferences in favor of the plaintiff. *al-Kidd v. Ashcroft*, 580 F.3d 949, 956 (9th Cir. 2009).

Where a motion to dismiss is granted, "leave to amend should be granted 'unless the court determines that the allegation of other facts consistent with the challenged pleading could not possibly cure the deficiency.'" *DeSoto v. Yellow Freight Sys., Inc.*, 957 F.2d 655, 658 (9th Cir. 1992) (quoting *Schreiber Distrib. Co. v. Serv-Well Furniture Co.*, 806 F.2d 1393, 1401 (9th Cir. 1986)). In other words, where leave to amend would be futile, the Court may deny leave to amend. *See Desoto*, 957 F.2d at 658; *Schreiber*, 806 F.2d at 1401.

/ / /

/ / /

/ / /

/ / /

/ / /

**DISCUSSION**

**I.     Equal Protection Claims (claims 1 and 2)**

Defendants argue that Plaintiffs' equal protection claims are subject to rational basis review and must be dismissed because the law rationally furthers a legitimate state interest.  Plaintiffs counter that AB 5 should be subject to strict scrutiny and alternatively, that even if rational basis review applies, Plaintiffs have adequately plead their claims.

**a.     AB 5 is Subject to Rational Basis Review**

The Equal Protection Clause of the Fourteenth Amendment provides that no State shall "deny to any person within its jurisdiction the equal protection of the laws."  U.S. Const., amend. XIV, § 1.  However, the Equal Protection Clause does not forbid classifications but rather "simply keeps governmental decisionmakers from treating differently persons who are in all relevant respects alike."  *Nordlinger v. Hahn*, 505 U.S. 1, 10 (1992).  Laws alleged to violate the constitutional guarantee of equal protection are generally subject to one of three levels of "scrutiny" by courts: strict scrutiny, intermediate scrutiny, or rational basis review.  *Tucson Woman's Clinic v. Eden*, 379 F.3d 531, 543 (9th Cir. 2004).  Strict scrutiny is applied when the classification is made on "suspect" grounds such as race, ancestry, alienage, or categorizations impinging upon fundamental rights.  *Kahawaiolaa v. Norton*, 386 F.3d 1271, 1277 (9th Cir. 2004).  The rationale behind heightened review on the basis of a suspect class is that such categories are "so seldom relevant to the achievement of any legitimate state interest that laws grounded in such considerations are deemed to reflect prejudice and antipathy . . . and because such discrimination is unlikely to be soon rectified by legislative means."  *City of Cleburne, Tex. v. Cleburne Living Ctr.*, 473 U.S. 432, 440 (1985).  Fundamental rights such as privacy, marriage, voting, travel, and freedom of association have also been afforded strict scrutiny review.  *Hoffman v. United States*, 767 F.2d 1431, 1435 (9th Cir. 1985).  In contrast, the Supreme Court has held that other rights are not fundamental, such as the right to government employment, *Massachusetts Bd. of Ret. v. Murgia*, 427

U.S. 307 (1976), or the right to a public education, *San Antonio Indep. Sch. Dist. v. Rodriguez*, 411 U.S. 1 (1973).

"[U]nless a classification warrants some form of heightened review because it jeopardizes exercise of a fundamental right or categorizes on the basis of an inherently suspect characteristic," courts will apply rational basis review and only consider whether the statute "rationally further[s] a legitimate state interest." *Nordlinger v. Hahn*, 505 U.S. 1, 10 (1992).

Here, Defendants argue that Plaintiffs' claims are subject to rational basis review since Plaintiffs do not allege that they are part of a suspect class and Plaintiffs' claims do not implicate a fundamental right. Plaintiffs counter that AB 5 is subject to strict scrutiny review because it infringes on a fundamental interest—namely, their "ability to make a living at their chosen, lawful occupation." ECF No. 9 at 15.

The Supreme Court has explained that "social importance is not the critical determinant for subjecting state legislation to strict scrutiny" but instead courts must ascertain whether such a right is "explicitly or implicitly guaranteed by the Constitution." *San Antonio*, 411 U.S. at 32-33. On this basis, the Supreme Court has denied strict scrutiny review to rights that it has otherwise recognized as socially significant. *Rodriguez*, 411 U.S. 1 (right to a public education); *Lindsey v. Normet*, 405 U.S. 56 (1972) (right of safe and sanitary housing); *Dandridge v. Williams*, 397 U.S. 471 (1970) (right of welfare benefits). The Supreme Court has declined to extend the application of strict scrutiny review outside of the existing scope since "the State has the authority to implement, the courts have been very reluctant, as they should be in our federal system and with our respect for the separation of powers, to closely scrutinize legislative choices." *City of Cleburne, Tex. v. Cleburne Living Ctr.*, 473 U.S. 432, 441–42 (1985). Here, Plaintiffs claim that the right to pursue their chosen, lawful occupation is a fundamental right but have not cited any case law—and the Court has not found any—supporting this argument. *Cf. Roe v. Wade*, 410 U.S. 113 (1973) (strict scrutiny review

8

accorded to right of a uniquely private nature); *Bullock v. Carter*, 405 U.S. 134 (1972) (right to vote); *Shapiro v. Thompson*, 394 U.S. 618 (1969) (right of interstate travel); *Williams v. Rhodes*, 393 U.S. 23 (1968) (rights guaranteed by the First Amendment); *Skinner v. Oklahoma ex rel. Williamson*, 316 U.S. 535 (1942) (right to procreate).

Plaintiffs have also referenced their proximity to the voting process in support of their argument. The right to vote has been accorded heightened strict scrutiny review in instances where the statute at issue infringes an individual's ability to participate in elections. *See, e.g., Harper v. Va. Bd. of Elections*, 383 U.S. 663, 670 (1966) (declaring poll tax unconstitutional); *Kramer v. Union Free Sch. Dist. No. 15*, 395 U.S. 621 (1969) (striking down state statute limiting school district elections voting to property owners and parents of students); *Dunn v. Blumstein*, 405 U.S. 330, 362 (1972) (striking down residence requirement for voting). However, the questions raised by restrictions on an individual's right to vote are markedly different from the issues raised by Plaintiffs' claims. As discussed above, Plaintiffs collect and distribute signatures from registered voters on various proposed ballot initiatives and referenda. This initiative process is one step removed from the act of voting since these proposed ballot initiatives have not yet qualified for inclusion on the voting ballot. Accordingly, signing a petition in support of an initiative does not constitute the exercise of the right to vote since there is no guarantee that any particular ballot initiative will qualify and appear on a voting ballot. Moreover, AB 5 does not impact the right to vote for an initiative once it has been placed on a ballot. While advocacy for ballot initiatives and referenda may have some connection to the electoral process as a whole, Plaintiffs have failed to show how the right to vote is denied or limited by any impact that AB 5 might have on the ballot initiative process.

In sum, Plaintiffs have not shown either that the right to pursue a lawful occupation merits strict scrutiny review, or, that the right to vote is implicated in their claims.

Accordingly, their claims do not warrant application of strict scrutiny review and must, instead, be analyzed under rational basis review.

### b.  Plaintiffs' Claims Fail Under Rational Basis Review

Under rational basis review, "legislation is presumed to be valid and will be sustained if the classification drawn by the statute is rationally related to a legitimate state interest." *City of Cleburne*, 473 U.S. at 440.  Accordingly, the Court need only determine whether AB 5 rationally relates to "a legitimate state interest."  Under rational basis review, a statute bears "a strong presumption of validity," and Plaintiffs bear the burden "to negative every conceivable basis which might support it." *F.C.C. v. Beach Commc'ns*, 508 U.S. 307, 314–15 (1993) (citations omitted).  "[E]qual protection is not a license for courts to judge the wisdom, fairness, or logic of legislative choices." *Id.* at 313.  In other words, this standard of review is a "paradigm of judicial restraint." *Id.* at 314.

Defendants argue that AB 5 was passed in order to remedy the widespread misclassification of workers as independent contracts—a phenomenon which has been a "significant factor in the erosion of the middle class and the rise of income inequality." ECF No. 8 (citing AB 5 § 1(c), Ch. 296, 2019-2020 Reg. Sess. (Cal 2019)).  The state legislature's asserted purpose in passing AB 5 was to redress the exploitation of workers who have been classified as independent contractors, thereby denied of the rights and protections that they would otherwise be afforded as employees—namely, minimum wage, workers' compensation, unemployment insurance, paid sick leave, and paid family leave.  AB 5 § 1(e), Ch. 296, 2019-2020 Reg. Sess. (Cal 2019)).  This stated purpose serves as a "plausible reason" that passes muster under the highly deferential rational basis review standard.  *See F.C.C.*, 508 U.S. at 315 (1993) ("a legislative choice is not subject to courtroom fact-finding and may be based on rational speculation unsupported by evidence or empirical data").

Plaintiffs argue, however, that the exemptions in AB 5 demonstrate "irrational animus" towards non-exempted companies like Plaintiffs since no rational basis exists for distinguishing certain businesses from others relative to the application of the ABC test under AB 5. Compl. ¶¶ 68, 70. Plaintiffs assert that legislators either made these exemptions arbitrarily or as political favors to groups who lobbied for such treatment. *Id.* ¶¶ 36, 38.

Defendants counter that the legislative history demonstrates that the exemption carve outs were based on a number of legitimate factors and rational explanations, including whether the workers hold professional licenses, are wholly free from direction or control of the hiring entity, perform "professional services," exert sufficient bargaining power, and set their own rate of pay. ECF No. 8 at 20-21. Legislators also considered the nature of the relationship between the contractor and client. *Id.*

Specifically, Plaintiffs highlight several exempted professions—direct sales salespersons, Cal. Lab. Code § 2750.3(b)(5), and newspaper carriers, Cal. Lab. Code § 2750.3(b)(7)—in support of their argument that there is no meaningful distinction between the exempted professions and the Collectors since their payment structures are similarly calculated (*i.e.*, based on production output rather than the number of hours worked), their work is not done from a fixed location, and their work is done pursuant to separately-executed contracts. ECF No. 14.

Defendants assert that Plaintiffs have failed to negate "every conceivable basis" that support the rationale behind these exemptions. *FCC v. Beach Commc'ns, Inc.*, 508 U.S. 307, 314-15 (1993). For both direct sales salespersons and newspaper carriers, Defendants point out laws which predate AB 5 that have distinguished both professions from other occupations. *See* ECF No. 15 at 2, 4 (citing Cal. Lab. Code § 1171; Cal. Code Regs. Tit. 8, § 11070(1)(C); Cal. Unemp. Ins. Code § 650; 26 U.S.C. § 3508(a)(1); citing 26 U.S.C. § 3508(b)(2)(A)(iii)).

11

Defendants argue that direct salespersons are differently situated than Plaintiffs since the salespersons offer public goods or services in exchange for money and therefore may require a higher degree of skill or training than Plaintiffs. *See* ECF No. 15 at 2-3. Additionally, direct sales salespersons negotiate their own commission rates or rates of pay, exercise a greater degree of control over their work, and communicate with their client directly about the nature of their work. *Id.* For similar reasons, Defendants argue that Plaintiffs' comparisons to newspaper carriers must fail given the distinguishable exchange of goods and relationship with customers inherent to the work of newspaper carriers. *Id.* at 4.

While the Plaintiffs focus on the similarities between these two categories of workers, they fail to acknowledge the differences identified by the Defendants which form the basis for the exemptions. In any event, under the highly deferential rational basis review standard, the Court declines to judge the "wisdom, fairness, or logic" of the California state legislature's choices. While some of these exemptions may arguably have been arbitrarily designed or the result of political motives, "[a]ccommodating one interest group is not equivalent to intentionally harming another." *Gallinger v. Becerra*, 898 F.3d 1012, 1021 (9th Cir. 2018). Defendants have shown that there is some "reasonable basis" for these classifications—namely, the attempt to remedy the widespread misclassification of workers as independent contractors—and no equal protection violation is found even if "in practice [legislation] results in some inequality." *Dandridge v. Williams,* 397 U.S. 471, 485 (1970).

## II.   Due Process Claims (claims 4, 5, and 11)

Plaintiffs argue that AB 5 violates their due process rights under both the U.S. and California state Constitutions. U.S. Const. amend. XIV, § 1; Cal. Const. art. I, § 7(a). The range of liberty interests that substantive due process protects is narrow and "[o]nly those aspects of liberty that we as a society traditionally have protected as fundamental are included within the substantive protection of the Due Process Clause." *Franceschi v.*

*Yee*, 887 F.3d 927, 937 (9th Cir.), *cert. denied*, 139 S. Ct. 648 (2018).  Substantive due process has, therefore, been largely confined to protecting fundamental liberty interests, "such as marriage, procreation, contraception, family relationships, child rearing, education and a person's bodily integrity, which are 'deeply rooted in this Nation's history and tradition.' "  *Id.* (citations omitted).  Courts have recognized a liberty interest based on some "generalized due process right to choose one's field of private employment," but that right is "subject to reasonable government regulation."  *Conn v. Gabbert*, 526 U.S. 286, 291–92 (1999).  Since the vocational liberty interest is not a fundamental right, and is therefore subject to "reasonable government regulation," the court need only determine whether there is a "conceivable basis" for the legislation.  *Dittman v. California*, 191 F.3d 1020, 1031 & n.5 (9th Cir. 1999).  Any burden that may exist on an individual's pursuit of her profession does not amount to a due process violation unless it acts as a "complete prohibition."  *Franceschi*, 887 F.3d at 938 (citing *Lowry v. Barnhart*, 329 F.3d 1019, 1023 (9th Cir. 2003) (holding that an "indirect and incidental burden on professional practice is far too removed from a complete prohibition to support a due process claim")).

Plaintiffs argue that enforcement of AB 5 would fundamentally preclude Data Processors from offering Collectors flexibility and autonomy, and Collectors would be required to declare allegiance to a single Data Processor, and "hope that that single Data Processor possessed enough work to make the Collector's job similarly remunerative to that which s/he pursued as an independent contractor."  ECF No. 9 at 21.  Plaintiffs argue that this amounts to a complete prohibition.  Defendants counter that the Collectors can still work as independently contractors if they satisfy the ABC test or fall under an exemption, and moreover, even if the Collectors' employment classification changes, the Data Processors could still offer the Collectors flexibility and autonomy as full employees.  *See* ECF No. 8 at 23.

In *Franceschi*, the plaintiff lawyer argued that deprivation of his driver's license amounted to a substantive due process violation since his license was "indispensable" to

the practice of law.  *Franceschi*, 887 F.3d at 938.  While the Ninth Circuit acknowledged the difficulties posed by the plaintiff's inability to drive himself around Los Angeles in pursuit of his legal practice, this burden did not amount to a complete prohibition.  Here, Plaintiffs argue that AB 5's burden would not be indirect or incidental, but would "absolutely and irrevocably" result in the loss of work for multiple individuals and entities.  ECF No. 9 at 22.  While Plaintiffs' allegations are different in kind from those in *Franceschi*, they nevertheless fail to establish that AB 5's effect would result in a complete prohibition in their work.  Accordingly, Plaintiffs have failed to show that they are entitled to relief and their due process claims are dismissed.

**III.    Restriction on Political Speech (claims 6, 7, 8)**

Plaintiffs argue that AB 5 violates their rights guaranteed by the U.S. and California state Constitutions—including the right to petition and to solicit support or opposition for political initiatives.  U.S. Const. amend. I; Cal. Const. art. II(a).  State legislatures are prohibited from enacting laws "abridging the freedom of speech, or of the press."  *McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 336 n.1 (1995).  Conduct-based laws may implicate speech rights where (1) the conduct itself communicates a message, (2) the conduct has an expressive element, or where, (3) even though the conduct standing alone does not express an idea, it bears a tight nexus to a protected First Amendment activity.  *Interpipe Contracting, Inc. v. Becerra*, 898 F.3d 879, 895 (9th Cir. 2018).  "Regardless of the theory, the conduct must be 'inherently expressive' to merit constitutional protection."  *Id.* (citations omitted).  The circulation of initiative petitions qualifies as "core political speech" since petition circulators "will at least have to persuade [potential signatories] that the matter is one deserving of the public scrutiny and debate that would attend its consideration by the whole electorate."  *Meyer v. Grant*, 486 U.S. 414, 421-22 (1988).

Defendants assert that Plaintiffs' claims must be dismissed since AB 5 does not qualify as conduct-based regulation and does not bear the requisite "tight nexus" to

Plaintiffs' free speech rights.  ECF No. 10 at 12.  The Ninth Circuit's decision in *Interpipe* is instructive.  The *Interpipe* plaintiffs challenged a state statute requiring any wage credit payments made to certain advocacy groups be paid through a collective bargaining agreement.  The *Interpipe* plaintiffs argued that this state law impermissibly regulated the employer use of employee wages in favor of those advocacy groups.  The court held that the statute neither regulated conduct containing an "inherently expressive" element nor did it bear a tight nexus to the employees' free speech rights since it was a "generally applicable wage law."  *Interpipe*, 898 F.3d at 896.  The *Interpipe* court cited *Minneapolis Star & Tribune Co. v. Minn. Comm'r of Revenue*, 460 U.S. 575 (1983) in order to illustrate its point.  In *Minneapolis Star*, the Court held that a special use tax imposed on paper and ink products violated the publications' First Amendment rights, noting that although purchasing ink and paper is not itself expressive conduct, the law at issue applied exclusively to products used by news publications and therefore "singled out the press for special treatment" in violation of the First Amendment.  460 U.S. at 582.

In contrast, AB 5 is a generally applicable law that regulates the classification of employment relationships across the spectrum and does not single out any profession or group of professions.[1]  Further, AB 5 does not regulate conduct that is inherently expressive.  *See Rumsfeld v. Forum for Academic & Institutional Rights, Inc.*, 547 U.S.

---

[1] In this sense, AB 5's carve outs are unlike the Telephone Consumer Protection Act ("TCPA") carve out, which provided an exception to the robocalling ban for entities in the business of collecting government debt.  *See Barr v. Am. Ass'n of Political Consultants, Inc*, 140 S. Ct. 2335 (2020).  In *Barr*, the plaintiff political consultants made calls to citizens to discuss candidates and issues, solicit donations, conduct polls, and get out the vote; they claimed that their political outreach would be more effective and efficient if they could also make robocalls to cell phones.  The *Barr* plaintiffs challenged the TCPA carve out under the First Amendment and argued that it could not be severed from the robocalling ban, thereby rendering the entire ban unconstitutional.  *Id.* at 2345.  The Supreme Court found the carve out provision violated the First Amendment since it impermissibly favored debt-collection speech over other speech and severed it from the remainder of the TCPA.

47, 66 (2006) (legislation tying funding to permitting military recruiters on campus does not target conduct that is "inherently expressive").

Plaintiffs cite *Buckley v. Am. Constitutional Law Found., Inc.*, 525 U.S. 182 (1999) in support.  However, the distinctions between *Buckley* and the issues at hand are more salient than any similarities.  In *Buckley*, the statute directly regulated the petition circulation process by requiring petition circulators to be registered voters, wear badges with certain specifications, and report personal identifying information.  The Court found that such requirements were unduly burdensome and unjustifiably inhibited the circulation of ballot-initiative petitions, noting that although states "have considerable leeway . . . with respect to election processes generally" statutes that "significantly inhibit communications with voters about proposed political change" are not warranted by state interests.  *Buckley,* 525 U.S. at 191-92 (1999).  Unlike the statute in *Buckley*, AB 5 does not impose any comparable requirements on the Collectors, and Plaintiffs have failed to show that AB 5 would significantly inhibit their communications with voters about proposed political change.

Plaintiffs additionally contend that California courts have held that the state constitution's protective provision provides stronger protections than the U.S. Constitution but do not expand on this argument and do not cite any analogous state case law.  California courts have noted that the state constitution's free speech protections are "more definitive and inclusive" than their federal analog.  *Robins v. Pruneyard Shopping Ctr.*, 23 Cal. 3d 899 (1979), *aff'd*, 447 U.S. 74 (1980).  Section 2 of article I of the California Constitution provides, "Every person may freely speak, write and publish his or her sentiments on all subjects, being responsible for the abuse of this right. A law may not restrain or abridge liberty of speech or press."  Cal. Const. art. I, § 2.  However, the California Supreme Court has explained that a determination that "a statute implicates the right to freedom of speech under article I does not mean that it violates such right."  *Beeman v. Anthem Prescription Mgmt., LLC*, 58 Cal. 4th 329, 345 (2013) (citations

16

omitted).  The *Beeman* court found that a statute imposing regulations on drug claims processors did not require the regulated entities to adopt or support any viewpoint or opinion and declined to apply heightened scrutiny since doing so would "open the door to intrusive and persistent judicial second-guessing of legislative choices in the economic sphere."  *Id.* at 363.  Ultimately, applying rational basis review, the *Beeman* court found that the statute was reasonably related to a legitimate government purpose and denied the plaintiff's California Constitution First Amendment claim.  As discussed above, AB 5 similarly passes constitutional muster—especially under the deferential rational basis review standard—and is reasonably related to a legitimate government purpose even under the more protective standard as set out by the California Constitution.

## IV.     Ninth Amendment Violation (claims 3, 9, and 10)

Plaintiffs allege that the United States Constitution's Ninth Amendment (claim 9), the California Constitution's "Baby Ninth" (claim 10), and the Inalienable Rights clause (claim 3) protect the "right to work on one's own terms—as an independent service provider, rather than an employee."  ECF No. 1 ¶¶ 81-83, 101.  Defendants move to dismiss these claims on the basis that these provisions are not interpreted as being "self-executing" and thus provide no private right of action.  ECF No. 8 at 27-29.

### A.     Ninth Amendment

The Ninth Amendment provides that "[t]he enumeration in the Constitution, of certain rights, shall not be construed to deny or disparage others retained by the people."  U.S. Const. amend. IX.  The California Constitution "Baby Ninth Amendment" similarly provides that this "declaration of rights may not be construed to impair or deny others retained by the people."  Cal. Const. art. I, § 24.  The Ninth Amendment "has not been interpreted as independently securing any constitutional rights for purposes of making out a constitutional violation," *San Diego Cty. Gun Rights Comm. v. Reno*, 98 F.3d 1121, 1125 (9th Cir. 1996) (citing cases), and is "*not* a source of rights as such; it is simply a rule about how to read the Constitution."  *San Diego*, 98 F.3d at 1125 (quoting Laurence

H. Tribe, American Constitutional Law 776 n. 14 (2d ed. 1988)) (emphasis in original). *See also Strandberg v. City of Helena*, 791 F.2d 744, 748 (9th Cir. 1986) ("The ninth amendment has never been recognized as independently securing any constitutional right") (internal citations omitted).

Plaintiffs appear to concede that the Ninth Amendment does not confer substantial rights, but argue that even if they are unable to gain an affirmative award by making a Ninth Amendment claim, they can still utilize the Ninth Amendment to challenge a state action which would otherwise "crimp[] a fundamental right." ECF No. 9 at 27. However, even if there were a constitutional right to work as an independent contractor, Plaintiffs have not pointed to any case that supports the notion that the Ninth Amendment has been incorporated into the Fourteenth Amendment as to apply against state government action. *See Am. Constitutional Law Found., Inc. v.* Meyer, 120 F.3d 1092, 1107 (10th Cir. 1997), *aff'd sub nom. Buckley v. Am. Constitutional Law Found., Inc*., 525 U.S. 182 (1999) (rejecting argument that the Ninth Amendment is incorporated in the Fourteenth Amendment); *Charles v. Brown*, 495 F. Supp. 862, 864 (N.D. Ala. 1980) (same). Accordingly, Plaintiffs have failed to demonstrate that they are entitled to relief under the Ninth Amendment or California's "Baby Ninth Amendment."

## B.    Inalienable Rights

The California Constitution's Inalienable Rights Clause provides that "[a]ll people are by nature free and independent and have inalienable rights." Cal. Const. Art. 1, § 1. Both state and federal courts have found that this clause identifies mere principles and does not create a private right of action. *Olson v. California*, No. CV1910956DMG, 2020 WL 905572, at *10 (C.D. Cal. Feb. 10, 2020) (citing *Bates v. Arata*, No. C 05-3383 SI, 2008 WL 820578, at *4 (N.D. Cal. Mar. 26, 2008), or*der clarified sub nom. Bates v. San Francisco Sheriff's Dep'*t, No. C 05-3383 SI, 2008 WL 961153 (N.D. Cal. Apr. 7, 2008); *Clausing v. San Francisco Unified Sch. Dist*., 221 Cal. App. 3d 1224, 1237 (1990)).

Plaintiffs again assert that they do not seek affirmative relief from the state but are instead seeking to prohibit the state from taking affirmative steps to divest Plaintiffs of their "fundamental right guaranteed by the California Constitution—the right to pursue a lawful occupation." ECF No. 9 at 19. As noted above, however, if AB 5 were to force the reclassification of the Collectors, this would not act as a complete prohibition on their right to pursue a lawful occupation and therefore does not provide the basis for a claim under the Inalienable Rights Clause.

For the foregoing reasons, the Court dismisses Plaintiffs' claim under the Ninth Amendment (claim 9), the California Constitution's "Baby Ninth" (claim 10), and the Inalienable Rights clause (claim 3).

## V.  Contract Claims (claims 12 and 13)

Plaintiffs also assert claims under the Contract Clauses of the U.S. Constitution and California state Constitution. U.S. Const. art. I, § 10, cl. 1.; Cal. Const. art. I, § 9. Plaintiffs argue that if AB 5 were enforced in a manner requiring the reclassification of the Collectors as employees, AB 5 would violate the Contract Clauses by invalidating already-existing contracts between the Data Processors and the Collectors. ECF No. 1 at 28-31. Defendants counter that AB 5 does not impose a substantial impairment on a contractual relationship, and even if it did, Plaintiffs' claims would fail given the public purpose motivating AB 5's passage. ECF No. 8 at 21-23.

Deferential review applies where a statute does not impair a state's own contractual obligations, as here. *RUI One Corp. v. City of Berkeley*, 371 F.3d 1137, 1147 (9th Cir. 2004). This review involves a three-step test: (1) "whether the state law has, in fact, operated as a substantial impairment of a contractual relationship"; (2) whether the state has "a significant and legitimate public purpose behind the [law], such as the remedying of a broad and general social or economic problem"; and (3) "whether the adjustment of the 'rights and responsibilities of contracting parties is based upon reasonable conditions and is of a character appropriate to the public purpose justifying

the legislation's adoption.'" *Id.* (quoting *Energy Reserves Grp.*, 459 U.S. at 411–13). Parties address only the first two of these steps.

### A.   Substantial Impairment

AB 5 does not require that Collectors be reclassified as employees, but only provides a new test for determining employee status.  Plaintiffs would therefore only be affected by AB 5 if it were enforced in a way that required reclassification of the Collectors as employees.  *Id.* ¶¶ 112-117.  However, at this juncture, any effect that AB 5 may have on Plaintiffs' contractual relationships is speculative and does not amount to "substantial impairment."

Additionally, a court is less likely to find substantial impairment when a state law "was foreseeable as the type of law that would alter contract obligations."  *Energy Reserves Grp., Inc. v. Kansas Power and Light Co.*, 459 U.S. 400, 416 (1983).  Here, although Plaintiffs do not provide information about when their most recent contracts were executed, it may be appropriately presumed that many of them did so after *Dynamex* was decided in April of 2018 since Plaintiffs engaged in the signature collection process in June 2018 and November 2018.  Compl. ¶¶ 61(k)-(o).  As such, Plaintiffs should have been aware that the ABC test could apply and the independent contractor status of their workers could be challenged, even before AB 5 was enacted. *See Olson*, 2020 WL 905572, at *12.

To support their position, Plaintiffs cite *Sonoma Cty. Org. of Pub. Employees v. Cty. of Sonoma*, 23 Cal. 3d 296 (1979).  However, in *Sonoma*, the statute at issue specifically declared null and void a specific set of agreements between local public agencies and their employees.   The court noted that even this direct impairment was not sufficient to find a violation of the Contracts Clause since "the state's police power remains paramount" and so the court must instead consider "the circumstances under which such impairment is permissible."  *Sonoma*, 23 Cal. at 305.  Here, Plaintiffs have failed to even show that there is a direct impairment comparable to the impairment

exacted by the statute at issue in *Sonoma*. As such, the Court need not engage in the analysis of whether such impairment is permitted.

### B.    Significant and Legitimate Public Purpose

Even if the Court were to find that AB 5 imposed a substantial impairment on Plaintiffs' contracts, Plaintiffs have failed to show that AB 5 does not serve a significant and legitimate public purpose.  A state may impose a substantial impairment on an existing contractual obligation so long as it has "a significant and legitimate public purpose behind the regulation, such as the remedying of a broad and general social or economic problem."  *Energy Reserves Grp.,* 459 U.S. at 412 (internal citations omitted).  The public purpose need not be addressed to an emergency or temporary situation.  *Id*.  As described above, the California state legislature enacted AB 5 in order to redress a broad economic social problem—namely, employment misclassification which has acted as "a significant factor in the erosion of the middle class and the rise in income inequality."  A.B. 5, Ch. 296, 2019–2020 Reg. Sess. (Cal. 2019).  Accordingly, AB 5 satisfies the public purpose prong of the test applied to challenges brought under the Contracts Clause and is a legitimate use of the State's police power.  *Metro. Life Ins. Co. v. Massachusetts*, 471 U.S. 724, 756 (1985) ("States possess broad authority under their police powers to regulate the employment relationship to protect workers within the State.") (quoting *DeCanas v. Bica,* 424 U.S. 351, 356 (1976)).

For the reasons stated above, Plaintiffs fail to state a claim for which relief may be granted under the Contract Clauses of the United States Constitution or the California Constitution.

## VI.   Declaratory Relief (claim 14)

The Declaratory Judgment Act does not grant litigants an absolute right to a legal determination.  *United States v. State of Wash.*, 759 F.2d 1353, 1356 (9th Cir. 1985) (citations omitted).  The decision to grant declaratory relief is a matter of discretion, even when the court is presented with a justiciable controversy.  *Id.*  In fact, the court may,

after a full consideration of the merits, exercise its discretion to refuse to grant declaratory relief because the state of the record is inadequate to support the extent of relief sought.  *Id.*  "The two principal criteria guiding the policy in favor of rendering declaratory judgments are (1) when the judgment will serve a useful purpose in clarifying and settling the legal relations in issue, and (2) when it will terminate and afford relief from the uncertainty, insecurity, and controversy giving rise to the proceeding."  Wright & Miller, 10B Fed. Prac. & Proc. Civ. § 2759 (4th ed.).  The plaintiff must demonstrate that the probability of that future event occurring is real and substantial, "of sufficient immediacy and reality to warrant the issuance of a declaratory judgment."  *Steffel v. Thompson*, 415 U.S. 452, 460 (1974); *see also Pac. Gas & Elec. Co. v. State Energy Res. Conservation & Dev. Comm'n*, 461 U.S. 190, 201 (1983) (the threatened injury must be "certainly impending").  Declaratory relief should be denied when it will neither serve a useful purpose in clarifying and settling the legal relations in issue nor terminate the proceedings and afford relief from the uncertainty and controversy faced by the parties.  *United States v. State of Wash.*, 759 F.2d 1353, 1357 (9th Cir. 1985).

Here, Plaintiffs argue that they have identified a justiciable dispute as to whether the Individual Plaintiffs are employees or independent contractors under the ABC test. Defendants counter that Plaintiffs have failed to show that they would be subject to any enforcement actions and therefore are seeking a declaratory judgment review of a law solely on the basis that AB 5 might affect them.

Generally, "courts particularly are reluctant to resolve important questions of public law in a declaratory action and under usual circumstances will not use declaratory judgments to halt state-law enforcement."  Wright & Miller, 10B Fed. Prac. & Proc. Civ. § 2759 (4th ed.).  Where the constitutionality of a state provision is at issue, the Supreme Court has taken into account the degree to which postponing federal judicial review would allow "the advantage of permitting state courts further opportunity to construe [the

challenged provisions], and perhaps in the process 'materially alter the question to be decided.' " *Renne v. Geary*, 501 U.S. 312 (1991).

Here, Plaintiffs have not alleged that they have been harmed by the passage of AB 5, that they are subject to enforcement under AB 5, nor that they would be materially affected even if they were subject to such enforcement.  Here, the recency of the passage of AB 5, the absence of any threat of the state's prosecution against Plaintiffs, and the uncertainty of AB 5's effect, if any, on Plaintiffs all counsel in favor of abstaining from issuing a declaratory judgment on this issue.  *See Armstrong World Industries, Inc. by Wolfson v. Adams*, 961 F.2d 405 (3d Cir. 1992) (shareholders' challenge of state's antitakeover statute was not ripe for judicial review when no takeover attempt existed, the shareholders were unable to point to any instance that would trigger the statute's application to the shareholders' detriment, and the shareholders did not face any threat of prosecution for noncompliance with the statute).

## VII.    Injunctive Relief (claim 15)

A plaintiff seeking permanent injunctive relief must demonstrate: (1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction.  *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006).  "A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Arc of California v. Douglas*, 757 F.3d 975, 983 (9th Cir. 2014).  "[A]n injunction is regarded as an extraordinary remedy, it is not granted routinely."  Wright & Miller, 11A Fed. Prac. & Proc. Civ. § 2942 (3d ed.).

Plaintiffs argue that Defendants should be preliminarily and permanently enjoined from enforcing AB 5 against Company Plaintiffs since such enforcement would force the reclassification of Individual Plaintiffs from independent contractors to employees and would additionally force Company Plaintiffs to retrain their staff, consult with legal counsel, and develop new compensation, benefits, and other policies.  Compl. ¶¶ 137-139.  Plaintiffs' cannot seek permanent injunctive relief since they have failed to establish that they are likely to succeed on the merits.  Nor can they meet the first prong of the four-part standard—namely, that they have suffered an irreparable injury.

Further, in considering the balance of equities and public interest, the Court finds that the scale tips in favor of Defendants.  Plaintiffs argue that public interest favors injunctive relief since many members of the public depend on their contractor status as a way to earn income without the "burdens and rigid demands of a tradition 9-to-5 job."  Compl. ¶ 143.  However, as the California Supreme Court noted in *Dynamex*, the ABC test was intended to benefit "law-abiding businesses that comply with the obligations imposed by the wage orders, ensuring that such responsible companies are not hurt by unfair competition from competitor businesses that utilize substandard employment practices" and also for the general public so that they are not "left to assume responsibility for the ill effects to workers and their families resulting from substandard wages or unhealthy and unsafe working conditions."  *Dynamex*, 4 Cal. 5th at 952-53.  As such, the Court finds that the balance of interests weighs against injunctive relief.

## VIII.    State Immunity

The Eleventh Amendment immunizes states, an arm of the state, its instrumentalities, or its agencies from suits brought in federal courts.  *Deanco Healthcare, LLC v. Becerra*, 365 F. Supp. 3d 1029, 1035 (C.D. Cal. 2019), *aff'd*, 806 F. App'x 581 (9th Cir. 2020).  There are three exceptions to this rule: (1) "Congress may abrogate that immunity pursuant to its lawmaking powers," *Kimel v. Fla. Bd. of Regents,* 528 U.S. 62, 80 (2000); (2) "a state may waive its Eleventh Amendment

24

immunity by consenting to suit," *College Sav. Bank v. Florida Prepaid Postsecondary Educ. Expense Bd.,* 527 U.S. 666, 670 (1999); and (3) "immunity does not apply when the plaintiff" sues a state official in his or her official capacity for prospective injunctive relief, *Seminole Tribe of Fla. v. Florida,* 517 U.S. 44, 73 (1996).  Here, Plaintiffs have brought their action against the State of California and Xavier Becerra in his capacity as Attorney General of the state of California.[2]  Defendants argue that the State of California is immune from suit in federal Court.  Plaintiffs argue that "immunity does not apply when the plaintiff sues a state official in his or her official capacity."  ECF No. 9.  The Court finds that under this applicable standard, while Xavier Becerra in his capacity as Attorney General may be properly named as a Defendant, the same cannot be said for the State of California.  Accordingly, even though all of Plaintiffs' claims have been dismissed for reasons described above, the Court nevertheless notes that the State of California would otherwise be immune from this action.

## CONCLUSION

The motion to dismiss is **GRANTED**.  Plaintiffs are granted leave to amend within the next 20 days.


**IT IS SO ORDERED.**

Dated:  August 17, 2020

Hon. Gonzalo P. Curiel
United States District Judge

---

[2] Plaintiffs have additionally named Defendant "John Doe" as a placeholder designation for any unidentified California official who has authority to enforce AB 5 against Plaintiffs.  Compl. ¶ 15.